JOURNAL ENTRY AND OPINION
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this Court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct. Prac.R. II, Section 2(A)(1).
{¶ 1} Defendant-appellant, Levon Burnett ("defendant"), challenges his convictions of murder, R.C. 2903.02(B), aggravated robbery, kidnapping, aggravated burglary, tampering with evidence, and obstructing justice as being against the manifest weight of the evidence. For the reasons that follow, we affirm.
 {¶ 2} The record evidence establishes the following: Defendant was close friends with Olyn Santos. Olyn has a cousin named Mike Santos. On July 28, 2004, the three men went to defendant's brother's apartment because Mike was interested in purchasing his car. They discussed payment but Mike reportedly did not have enough money to buy the car.
 {¶ 3} According to Olyn, Mike wanted to rob someone. Olyn, Mike, and defendant began drinking alcohol and discussing a potential target. Defendant suggested that Harry Gonzalez, aka, "Hottie," would be a good "lick," meaning a person to rob. Defendant then reportedly detailed where he believed Hottie kept large amounts of cash in his residence. The men were familiar with the victim because a relative of Mike and Olyn had previously lived with him.
 {¶ 4} Mike, Olyn, and defendant continued to drink throughout the day and drove around in Mike's champagne-colored Cadillac to various locations. At some point, they made efforts to obtain a gun but were unsuccessful. Eventually, the three men returned to defendant's brother's residence at which point defendant entered the apartment and retrieved three knives to use as part of the intended robbery. Defendant's brother confirmed that knives were missing from his collection around the relevant time.
 {¶ 5} According to Olyn, defendant and Mike were to enter Hottie's residence to rob him and Olyn was going to drive the get-away vehicle. But, afterthe men parked a few houses away, defendant decided he did not want to go inside. At that point, the plan changed and Olyn went with Mike while defendant stayed behind in the car.
 {¶ 6} Olyn and Rau[1] recounted that the Santos cousins gained entry by false pretenses; specifically, Mike asked Hottie if he could come inside to wash his hand that was bleeding. Mike and Olyn entered the home while concealing the knives that each possessed. Once inside, Mike went to the kitchen where he knocked over a fan. When Hottie went to investigate the crash, Mike stabbed him in the forearm with a hunting knife. Hottie screamed for his friend Raul. Raul said he was prevented from responding due to Olyn brandishing a knife at him. Raul could see that Hottie was frightened. Raul ran from the house in fear for his life.
 {¶ 7} Raul frantically drove from the scene while making phone calls to his mother and the victim's brother. Raul also observed the champagne-colored Cadillac parked a few houses down. He saw a black male with earrings sitting in the driver's seat and watching the victim's house. Raul then contacted 911 and reported that the victim was being beat up inside his house. Raul was not aware that Mike had a knife because he could only partially see inside the kitchen before he fled. Raul continued to circle the block, concerned for the safety of his friend.
 {¶ 8} Meanwhile, Olyn rummaged through the victim's house looking for the money, including the locations that defendant had described. When he was unsuccessful, he returned to the kitchen to find the victim on the floor against the cupboards, bleeding and crying. Mike ordered the victim to close his eyes as Olyn was telling Mike to calm down. Olyn rushed around the house trying to find something of value and grabbed a video game machine. Nonetheless, Mike threw the victim on the floor and was stabbing him in the head repeatedly when Olyn fled the scene.
 {¶ 9} Olyn returned to defendant, who was in the Cadillac, and told him what was occurring inside. Although defendant said he wanted to leave he did not do so, and obliged Olyn's request to wait for Mike. Mike exited the house covered in blood and smiling. The men left the scene.
 {¶ 10} Eventually, Raul saw the Cadillac speed away. Raul then went back inside Hottie's house and discovered the video game machine missing and Hottie laying on the kitchen floor in a pool of blood. Hassan, the victim's brother, arrived and began screaming. Both men were in the front yard when the police arrived.
 {¶ 11} Upon arriving at the residence, police encountered two distraught males in the yard and a young man on the kitchen floor who had been brutally stabbed to death. The responding officer described the scene as "grotesque," "horrible," and akin to a "slaughterhouse." Further, the victim's house was in disarray, with belongings and drawers strewn about the house. The two men from outside, who were later determined to be the victim's brother and friend, Hassan and Raul respectively, were placed in police cars and questioned.
 {¶ 12} Mike, Olyn, and defendant were seen together after the murder by various eyewitnesses. Defendant threw one of the knives used in the commission of the robbery out of the car window. Some witnesses confirmed that Nuke (defendant's nickname) purchased a tee shirt from an individual in a McDonald's parking lot. Olyn further testified that he and defendant drove Mike's Cadillac to New York where the two abandoned the car and stayed with a friend the following night. The next day, Olyn's father drove to New York and picked the two boys up and returned to Cleveland, where Olyn turned himself in to the authorities.
 {¶ 13} Cleveland Police arrested Mike Santos on July 31, 2004 for the murder.
 {¶ 14} Defendant was later arrested and indicted with the charges detailed previously. Both Olyn and Mike Santos pled guilty and were sentenced forthe murder of Harry Gonzalez prior to defendant's trial. Following defendant's trial, the jury found defendant not guilty of aggravated murder but guilty on all the remaining charges. Defendant assigns the following sole assignment of error for our review:
 {¶ 15} "I. The jury verdicts regarding the counts for murder, aggravated robbery, aggravated burglary, and kidnapping were against the manifest weight of the evidence and thus denied appellant due process under the Ohio and United States Constitutions."
 {¶ 16} Defendant maintains that his convictions are against the manifest weight of the evidence. A manifest weight challenge questions whether the State has met its burden of persuasion. State v.Thompkins (1997), 78 Ohio St.3d 380, 390. When a defendant asserts that his conviction(s) is/are against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id., supra at 387.
 {¶ 17} The jury convicted defendant of the following charges: murder in violation of R.C. 2903.02(B); aggravated robbery in violation of R.C.2911.01 (A) (1 ); kidnapping in violation of R.C. 2905.01(A)(2); aggravated burglary in violation of R.C. 2911.11(A)(1); tampering with evidence in violation of R.C. 2921.12; and obstructing justice in violation of R.C. 2921.32.
 {¶ 18} The jury, however, acquitted defendant of the charge of aggravated murder as charged in count one of the indictment.
 {¶ 19} Defendant contends that the verdicts are against the weight of the evidence for essentially the following reasons: he believes the jurors were influenced by the crime scene photos and the factual circumstances surrounding the case, and that he was just a "follower" and not culpable for the actions of Mike and Olyn Santos.
 {¶ 20} R.C. 2923.03 prohibits complicity with others to commit crimes and provides as follows:
 {¶ 21} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 22} "(1) Solicit or procure another to commit the offense;
 {¶ 23} "(2) Aid or abet another in committing the offense;
 {¶ 24} "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
 {¶ 25} "* * *
 {¶ 26} "(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were the principal offender. A charge of complicity may be stated in terms of this section, or in the terms of the principal offense."
 {¶ 27} A person aids and abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime, and shares the criminal intent of the principal. State v. Johnson (2001), 93 Ohio St.3d 240, 245-246. Such intent may be inferred from the circumstances surrounding the crime. Id. Participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed.State v. Pruett (1971), 28 Ohio App.2d 29, 34. Specifically, when a person sets in motion a "sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for the direct, proximate and inevitable consequences of death resulting from his original act." State v.Williams (1990), 67 Ohio App.3d 677, 683. It is not necessary that the accused be in a position to foresee the precise consequence of his conduct, only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct. State v. Losey (1985),23 Ohio App.3d 93, 95-96.
 {¶ 28} Contrary to defendant's assertions, there is ample evidence in the record that he aided and abetted Mike and Olyn Santos in the commission of the robbery that resulted in the murder of Harry Gonzalez. Defendant suggested the victim as a robbery target; described the possible location of the cash in the victim's house; and supplied the Santos cousins with the knives they used in perpetrating the crimes. Moreover, defendant waited in the car knowing that the Santos were entering the victim's house with the purpose of robbing him. Defendant did not leave the scene or abandon the robbery plot and he did not report the impending robbery to the authorities. Although defendant indicated a desire to leave the scene upon learning of Mike Santos' actions, he did not do so, and instead waited for Mike to get back into the car before driving away. Even though defendant claims he stayed with the group for fear of what Mike would do to him, the evidence shows that he fled to New York with Olyn even after Mike split off from the group. Defendant also disposed of one of the knives after the crimes were committed and he, along with Olyn, abandoned the get-away car in New York. The jurors properly weighed the evidence and obviously deliberated over the charges as reflected by the not guilty verdict on the charge of aggravated murder. Apparently, the jurors concluded on the evidence that defendant did not specifically intend to murder Harry Gonzalez. Instead, the jurors found defendant culpable under the felony murder statute, which provides: " No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The murder of Harry Gonzalez was the proximate result of the plot to attempt to rob him and burglarize his home.
 {¶ 29} Defendant was not merely present at the scene. As set forth above, he actively participated in planning and preparing to commit the crime, waited in the car during its commission, and remained with the principal offenders for a significant period of time after the crimes were committed, during which time he participated in the disposal of instruments utilized in the commission of the offenses, i.e., knife and car. Further, defendant's claim that he abandoned his role and involvement in the crimes simply by remaining in the get-away vehicle is without merit. "[0]nce a criminal intent has been formed, coupled with an overt act toward the commission of an offense, abandonment is no defense." State v. Quinnie (July 9,1998), Cuyahoga App. No. 72580, citing State v. Cooper (1977), 52 Ohio St. 2d 163. Defendant did nothing to thwart the success of the Santos' efforts to rob and burglarize the victim and his home, he did not manifest a complete renunciation of his criminal purpose, and he did not communicate an intention to abandon the plot and/or inform the authorities of the impending crime. See 2923.01 (l)(1) and (2).
 {¶ 30} Defendant's convictions are not against the manifest weight of the evidence.
 {¶ 31} Defendant's sole assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, J., and ANN DYKE, J., CONCUR
[1] Raul was a friend of the victim who was present during the robbery.